### RICAUD v. WILMINGTON SAVINGS & TRUST CO. et al.

(Circuit Court of Appeals, Fourth Circuit. November 7, 1895.)

#### No. 127.

CORPORATIONS—TRANSFER OF STOCK BY EXECUTOR—ESTOPPEL.

One D., a stockholder in the W. bank, died in 1882, leaving a will by which he gave all his property to his wife for life, "to be hers absolutely," and at her death to go to his son and daughter, to be divided between them as his wife might think proper. D.'s wife qualified as executrix, and took possession of the estate, but did not transfer the bank stock. She died in 1888, leaving a will disposing of the property, upon the assumption that she had entire power of disposition of it, and her disposition of it was acquiesced in by her son and daughter. One F., who was appointed executor of Mrs. D.'s will, qualified as such, and thereby became executor of D. He caused the bank stock to be transferred into his name "as executor," and testified that he meant thereby executor of Mrs. D. The bank officer who made the transfer testified that he understood the stock was transferred to F. as executor of Mrs. D. At the time of the transfer, in 1888, the bank was solvent and prosperous. The stock was held by F. as part of a trust fund created by Mrs. D.'s will for her daughter, as a means of paying a debt from D. to the daughter, in such a way as to keep the money beyond the control of the daughter's husband. The W. bank failed in 1891, and the receiver sought to hold the estate of D. responsible for an assessment on the stockholders. *Held* that, as the stock could only have been transferred by the act of D.'s executor, and as F. declared, and the bank understood, when the transfer was

made, that it was made to him as executor of Mrs. D., and he had power to receive it in that capacity, without regard to the terms of the wills, the bank, and consequently the receiver, were estopped to claim that D. and his estate had not ceased to hold stock at the time of the transfer, there being no ground to impute bad faith to any of the parties.

Appeal from the Circuit Court of the United States for the Eastern District of North Carolina.

This was a suit by A. G. Ricaud, receiver of the First National Bank of Wilmington, N. C., against the Wilmington Savings & Trust Company, Fannie G. Pollock, and R. F. Tysen, to establish a claim against the estate of James Dawson, deceased. The circuit court dismissed the bill. Complainant appeals. Affirmed.

This case comes up on appeal from the circuit court of the United States for the Eastern district of North Carolina.

James Dawson, a man of comfortable fortune, was a stockholder in the First National Bank of Wilmington, N. C. He controlled in all 210 shares, of the par value of $100 each. Of these, 185 shares stood in his own name, and 25 shares stood on the books of the bank in the name of Jacob Loeb, but were transferred on their back to, and were owned by, James Dawson. Besides these shares, there were two other shares standing in the name of M. S. Dawson, the wife, and two more shares standing in the name of James M. Dawson, the son, of James Dawson. James Dawson was a resident of Wilmington, but he spent a portion of the latter part of his life at the Windsor Hotel, New York. He died some time in 1882, leaving a will dated in 1876. By this will he gave to his wife, Missouri S. Dawson, all his "real estate and personal property of every kind and description during her natural life, to be hers absolutely, at her death to go to my children, Frances Grey and James, to be divided between them in any way she may think proper, and giving to each whatever her judgment may think best." He then gives her full power of sale over any and all the property, and of reinvestment, the purchaser not to be bound to see as to the application of the purchase money. She could make any improvements on the real estate that she thought proper, without let or hindrance from any one, nor was she to account for the income, but could use it as she preferred. He named his wife sole executrix. Upon his death, the wife, Missouri S. Dawson, qualified on his will as executrix, and took charge of all of the property. She made no change in the stock as it stood on the books of the bank at the death of James Dawson. She departed this life some time in 1888, leaving in force a last will and testament, bearing date 22d December, 1887. The will is carefully and elaborately prepared, and has evident proof of the conviction on her mind that she could dispose by will, or, at the least, exercise a power of appointment over, all the property she held under her husband's will. After one or two unimportant bequests, she gives to her executors the sum of $30,000, to be held in trust to pay the income annually to her daughter, Frances Grey, now Fannie Pollock, during her natural life, and at her death to pay over the principal between and among her children, with one exception, a son by the first marriage of her daughter. If her personalty was insufficient to pay this legacy, she charged her realty with it. She then devises her realty to her executors, as to one part thereof, in trust for her son, James M. Dawson, for life, with remainder to his children in fee. In the event of his death without issue, then to his sister, Frances, for life, with remainder to her children, with the same exception of a child by her first marriage. As to the other part of the realty, the executors are to hold the same in trust for her daughter, Fannie, for life, remainder to her children in fee, saving the same son by her first marriage, with cross remainder to James M. Dawson for life, remainder to his children in fee if Fannie die without issue. In the event of both children dying without issue, the realty is divided equally between the surviving heirs of her husband and herself. She named as her executors her son, James, her daughter, Fannie, and William Hildreth Field, giving them full power of sale. Field alone qualified

as executor. As has been seen, Mrs. Dawson treated all the property which came to her under the will of her husband as disposable under her will, and in this she seemed to be sustained by her son and daughter, both of whom were of full age. The executor, with their knowledge, and, if not with their express assent, certainly without objection on their part, proceeded to create the trust fund of $30,000, to be held in trust for Mrs. Pollock. In this fund he placed some Nevassa stock, notes, and all this national bank stock. To this end he caused to be transferred on the books of the bank the 185 shares standing in the name of James Dawson into his name, as executor: the 25 shares standing in Loeb's name also into his name, as executor. Each of the certificates of two shares standing in the name of James M. Dawson and of Missouri S. Dawson, respectively, were transferred into his name, as executor. These were all a part of the trust fund. He says that the transfer into his name, as executor, was as executor of Missouri S. Dawson. The bank officer in charge of stock transfers also knew that he was transferring the stock to himself as executor of Missouri S. Dawson.

As this may be the turning point of the case, it is best to state the evidence in full. On his direct examination, Field had sworn that finally he had all the certificates in the bank transferred to himself, as executor. Having been then asked "Executor of whom?" he answered "Executor of Missouri S. Dawson"; and that as such executor he had appropriated the securities to the creation of the trust fund. On the cross-examination he was asked: "Question. I understand you to say that in making the transfer on the books in the bank you acted as executor of Missouri S. Dawson. Is this correct? Answer. I don't know what the transfers were. Mr. Larkins had the custody of them, and he took them to the bank, and said, 'I will have them transferred to your name.' I was desirous of having the custody and control of the personal assets of the estate. What was transferred on the books of the bank, I do not know. The certificates of stock in the bank will speak for themselves, but I certainly took them as executor of Missouri S. Dawson's estate, as I understood it." A. K. Walker, who kept the stock accounts in the bank, testifying as to the same transaction, says (having been shown the certificate in question): "Question. Please look at this paper, and see if you recognize your handwriting on them. What are these papers? Answer. They are certificates of the First National Bank of Wilmington. Q. Examine the indorsements on these certificates. Is there anything in your handwriting there? A. The filling up of the certificates is in my handwriting. Q. The assignment seems to be to William Hildreth Field, executor. Of whom was he executor? A. I understood him to be executor of Mrs. Missouri S. Dawson. Q. And in that capacity the stock was assigned to him? A. I understood so. The old certificates bearing the name of James Dawson were then all canceled."

On the —— day of November, 1891, the First National Bank of Wilmington failed and was closed. The comptroller of the currency took charge of the bank and its assets by a receiver appointed by him, and, after investigating its affairs, made an assessment of $100 per share on each shareholder. The bill in this case is filed to obtain this assessment from the estate of James Dawson. It claims and avers that the stock standing in the name of James Dawson has never ceased to be a part of his estate, and that it now belongs to it; that the transfer made by Field to himself, as executor, was as executor of James Dawson, and, if it was intended to be to himself as executor of Missouri S. Dawson, was void. The bill also charges that Mrs. Fannie Pollock, the daughter of James Dawson, and by the death of her brother intestate, in 1888, his only surviving heir at law, has attempted to dispose of the real estate left by the said James Dawson, in order to avoid the payment of the said assessment; and that, inasmuch as the personalty in the estate of James Dawson is not sufficient to pay his debts, and the real estate is needed for this purpose, such attempted disposition of the realty by the heir at law is in fraud of creditors, and null and void.

To this bill Fannie G. Pollock, R. F. Tysen, her alienee of the property, and the Wilmington Savings & Trust Company, administrator de bonis non cum testamento annexo of James Dawson, substituted in lieu of Field, the executor who was removed, are parties defendant.

The issue made by the bill and answers is, was the estate of James Dawson owner of these shares in the First National Bank of Wilmington, N. C., at the date of its failure?

D. L. Russell and George Rountree, for appellant.

R. H. Battle, A. Prentice, and Thomas W. Strange, for appellees.

Before SIMONTON, Circuit Judge, and HUGHES, District Judge.

SIMONTON, Circuit Judge (after stating the facts). This question depends upon the construction of the transaction in April, May, and June, 1888, whereby the stock standing in the name of James Dawson was transferred into the name of William Hildreth Field, executor. By the will of Missouri S. Dawson, he was her executor. By operation of law, eo instanti, upon his qualification as executor of Missouri S. Dawson, he became the executor of James Dawson, of whom she was executrix. He swears that when the transfer was made to him, as executor, by his direction, he meant executor of Missouri S. Dawson, and this was also the understanding of Asa K. Walker, the corresponding clerk and general assistant in the bank, who kept the stock account and made the transfer. So his purpose, made known by him to the proper officer of the bank, was to transfer the certificates of stock from the name of James Dawson to himself, as executor of Missouri S. Dawson. The transfer was made. How .was it made? As the certificates stood in the name of James Dawson, they were transferable only by him in person or by his attorney. Upon his death the transfer could be made only by his personal representative or his attorney. No legatee under the will could make such transfer, or authorize such transfer. When, therefore, the transfer was made, as in fact it was made, it could only have been done by Field, who was in law the executor of James Dawson. As such executor, he had this authority,—no one else had such authority, —and he exercised it, and, only because of such exercise, the bank could and did make the transfer. The bank could not say that the transfer was made under the authority of the executor of Missouri S. Dawson, for as such executor he had no such authority. The bank would be estopped from denying that the transfer was by the proper representative of James Dawson, and in this the receiver is affected by the same estoppel. It must be remembered that no well-founded suspicion can exist that this transfer in 1888 was intended to defeat any creditor of the bank, or to avoid liability as a stockholder. At that time, and for three years afterwards, the bank was in credit, and no fear of its insolvency existed. Up to a very short time before its failure, gentlemen of sound judgment, members of the bar of high standing, purchased shares in it. So, whatever may have been the motive or purpose of this transfer, such motive or purpose could not have been to defeat the creditors of the bank, and in that alone has the complainant any interest. This being so, as the bank would be estopped by the transfer, its receiver is.

It is said, however, that Missouri S. Dawson was simply a life tenant; that she left no estate; that her directions to her executor to make a trust capital of $30,000 from the personalty and realty of

her estate were idle words, and his execution of her directions idle acts. Missouri S. Dawson did by her will attempt to dispose of this real and personal property. Her testator left no debts unpaid, except perhaps to his daughter, Fannie. She herself had none. The only persons who could complain of her action were her son and this daughter, the only distributees of her husband and testator. They did not complain, indeed they acquiesced, and Fannie Pollock, the survivor, in her answer recognizes the right of her mother so to dispose of her personalty. This family arrangement, in the absence of fraud, will not be disturbed. It may be that because of certain unhappy conditions in the family, glimpses of which appear in the testimony, both mother and daughter approved of these dispositions, to protect the latter from the extravagance and importunity of her husband. But, if this be so, it is something of which the receiver cannot complain, for it was no fraud on him, or the creditors he represents. In any event, Field was an active, living executor, a person, in the law, capable of taking, and if the stock standing in the name of James Dawson was transferred to him in his name and character as executor, it is passed out of the estate of James Dawson into his hands as executor of Missouri S. Dawson. The transfer, when thus consummated, destroyed the relation of membership between the corporation and James Dawson and his estate, with all its incidents, and created an original relation with the transferee, the executor of Missouri S. Dawson. National Bank v. Watsontown Bank, 105 U. S. at page 222. On the failure of the bank, three years afterwards, neither James Dawson nor his estate were shareholders, and so not liable to the assessment.

One other point of view suggests itself. At the failure of the bank the stock stood in the name of "William Hildreth Field, executor." Of whom? It had been in the name of James Dawson up to 1888. Parol evidence would be admitted to show who was the owner. Turnbull v. Payson, 95 U. S. 418. Now, the evidence is that Field intended to transfer that stock to himself, as executor of Missouri S. Dawson, and that after the transfer he held it as such executor, and with it carried out a part of the purpose of his testatrix, and the bank officer, transferring the stock, knew that he was taking it as the executor of Missouri S. Dawson. This testimony is not contradicted. The conclusion, therefore, cannot be resisted that the transfer was made in 1888, and thenceforward the estate of James Dawson ceased to hold the legal title to the stock, and its corresponding liability also ceased. Bank v. Case, 99 U. S., at page 631; Whitney v. Butler, 118 U. S. 655, 7 Sup. Ct. 61.

It may be discussed from yet another standpoint. Mrs. Fannie Pollock, the daughter of James Dawson, and his sole surviving heir, during her father's lifetime married one Charles E. Greenough. He died, leaving her a legacy of $50,000, absolutely, with some other property contingent on her continual widowhood. She gave to her father the check for the $50,000, and he drew and received the money, passing it to his own credit in bank. She testifies that this was a loan to her father, and that he paid her interest during his life; that upon his death, she having in the meanwhile married Pollock, she

received from her mother $20,000, leaving $30,000 unpaid; that her husband spent the $20,000, and that her mother refused to pay the rest, fearing that it would meet the same fate. The provision made in her will as to the trust fund of $30,000 was made as a payment of this debt. The whole transaction has been challenged by the complainant, and strong suspicions of fraud are alleged. But there is her sworn testimony, with that of Field, her mother's adviser, the existence and production of the check indorsed to and by her father, and evidently carried to his credit. There never is a presumption of a gift by a child to its parent, especially when the parent is in no need. There is not a particle of evidence going to show that this was not a loan. Nor is the mode provided for its repayment so absurd or abnormal as to raise conclusive doubts regarding it. Mrs. Pollock had received and had lost $20,000 of the $50,000. Her mother wanted to secure the remainder. She was out of debt. Her husband's estate owed nothing but this. So she, exercising the very large control given her in the will, secured a fund of $30,000 for her daughter, as a mode of refunding the money which James Dawson had received from her. Carrying out the instructions of his testatrix, Field transferred the stock to himself, as executor, and held it as part of the trust fund. This was all done in 1888. There cannot be any reasonable suspicion that it was done in contemplation of the failure of the bank. Who could complain of it? The husband of Mrs. Pollock might have done so. He could have exercised his marital right, and reduced into possession this chose in action of his wife. The record discloses no effort by him to this end, and no complaint or protest. Pollock and his wife were divorced in April, 1890. Thenceforward she was discovert and sui juris. She never objected to the action of the executor. This being so, Field, the executor of both estates, transferred to himself, as executor of Missouri S. Dawson, and held, as trustee, under the instruction of his testatrix, this stock in the national bank, thus liquidating a debt of James Dawson, in whose name, up to that time, the stock stood. Thenceforth the name of James Dawson disappeared from the books of the bank, and on its failure, in 1891, neither he nor his estate were shareholders.

The decree of the circuit court dismissing the bill is affirmed.